## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

|  |  |
|---|---|
| **JOHN E. SHAVERS,** | **CASE NO. 03-55729-NPO** |
| **DEBTOR.** | **CHAPTER 7** |

**ADV. PROC. NO. 04-05038-NPO**

|  |  |
|---|---|
| **ANN B. SHAVERS, JAMES KOERBER,** | |
| **HERBERT J. STELLY, SR., AND** | **CROSS-CLAIMANTS AND** |
| **JPMORGAN CHASE BANK, N.A.** | **CROSS-DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER DETERMINING
## VALIDITY, EXTENT, AND PRIORITY OF LIENS

This matter came before the Court for trial on June 25 and June 26, 2009, (the "Trial") on

the Crossclaim To Determine Validity, Extent and Priority of Liens (the "Crossclaim") in the above-

styled adversary proceeding (the "Adversary"). (Dkt. No. 3).[1] At Trial, Ann B. Shavers ("Ann

Shavers") appeared *pro se,* Michael V. Ratliff represented James A. Koerber ("Koerber"), Robert

Gambrell represented Herbert J. Stelly, Jr. ("Stelly"), and William H. Leech and Danny E. Ruhl

represented JPMorgan Chase Bank, N.A. ("Chase"). The Court,[2] having considered the evidence

presented at Trial, determines on the Crossclaim as to the priority of liens in this Adversary, as

follows: (1) Ann Shavers should be ranked first in the principal amount of $93,946.51; (2) Koerber

should be ranked second in the principal amount of $48,531.67; (3) Stelly should be ranked third in

the principal amount of $250,000; and (4) Chase should be ranked fourth in the principal amount of

---

[1] All docket numbers refer to the docket of the Adversary, unless otherwise noted.

[2] This bankruptcy case and Adversary were transferred by United States Bankruptcy
Judge Edward R. Gaines to United States Bankruptcy Judge Neil P. Olack on February 10, 2009.

$498,967.11.  The Court further determines that these liens attach in that order to the net sales proceeds that are currently being held in the registry of the Court pursuant to the Consent Order entered on February 7, 2007.[3]  (Dkt. No. 225).

## Introduction

Dwayne M. Murray ("Murray"), chapter 7 trustee for the bankruptcy estate of John E. Shavers ("John Shavers"), filed a Complaint To Avoid, Recover and Preserve Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544(b), 550(a) and 551 (the "Complaint") (Dkt. No. 1) on March 31, 2004, against J. Steven Smith ("Smith"), chapter 7 trustee for the bankruptcy estate of Ariana Lynn Shavers ("Ariana Shavers") in Case No. 03-53855.  In his Complaint, Murray sought as relief a judgment (1) declaring the transfer of certain real property, referred to herein as the Bayou Residence,[4] by John Shavers to his infant daughter, Ariana Shavers, voidable under 11 U.S.C. § 544(b) and Miss. Code Ann. § 15-3-3; (2) recovering the Bayou Residence from the bankruptcy estate of Ariana Shavers under 11 U.S.C. § 550(c); and (3) preserving the Bayou Residence for the benefit of John Shavers's bankruptcy estate.  Smith filed his Answer, Counterclaim and Crossclaim on April 14, 2004.  (Dkt. No. 3).  In his Answer, Smith denied the relief requested by Murray and in his Counterclaim sought a declaratory judgment that the Bayou Residence belonged to  Ariana Shavers's bankruptcy estate pursuant to 11 U.S.C. § 541.  Smith joined as defendants numerous persons in an attempt to obtain a conclusive determination of  the validity, extent, and relative priority of their competing claims in the estate property. (Dkt. No. 3).

_____

[3] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] The real property included a home located in the Bayou Plantation Subdivision at 10761 Plantation Lane in Gulfport, Mississippi (the "Bayou Residence").

On July 9, 2004, this Court entered a judgment approving a settlement reached between the bankruptcy estates of John Shavers and Ariana Shavers in which both trustees agreed to avoid the transfer of the Bayou Residence made on September 23, 2002, by John Shavers to Ariana Shavers pursuant to 11 U.S.C. § 548. (Dkt. No. 20). This settlement allowed that property to be administered by Murray on behalf of the John Shavers's bankruptcy estate. Accordingly, on October 25, 2004, this Court entered a Consent Order dismissing Smith as a defendant/counter-plaintiff and substituting Murray as the sole plaintiff/counter-defendant against the cross-defendants. (Dkt. No. 43).

Ultimately, Murray sold the Bayou Residence for $625,000 and deposited net sale proceeds of $534, 314.95[5] with the Clerk of this Court until determination of proper distribution among the cross-defendants. (Dkt. No. 229). By Consent Order, this Court dismissed Murray from this Adversary. (Dkt. No. 225). What remains at issue is the validity, extent, and priority of liens against the net sales proceeds, which are insufficient to satisfy all lien claimants. At this point, there are four potential claimants to the fund: Ann Shavers, Koerber, Stelly, and Chase (referred to herein collectively as the "Four Claimants").[6]

---

[5] With this Court's approval, Murray paid certain expenses from the gross sale proceeds, including a 5 per cent real estate commission, survey costs, legal fees, and taxes, and carved out 10 per cent of the net proceeds, of $58,686.27, for the benefit of the John Shavers's bankruptcy estate. Murray deposited the remaining amount, $528,176.43, in an interest-bearing account. (Dkt. Nos. 162, 225).

[6] Many cross-defendants were named in this Adversary, but only the Four Claimants have any chance of satisfying their debts. The other named parties included: B.G. Perry as Custodian for Ariana Shavers, the United States of America Internal Revenue Service (the "IRS"), Flint Creek Farms Company Limited, Continental Casualty Company, Hancock Bank, and United States Fire Insurance Company. A Stipulation of Dismissal as to the IRS was entered on June 8, 2004. (Dkt. No. 14). A default judgment was entered against B.G. Perry and Flint Creek Farms Company, Limited on November 5, 2004, and as a result, they are no longer parties in this Adversary. (Dkt. No. 45). Orders were entered dismissing United States Fire Insurance Company on June 24, 2009 (Dkt. No. 316); Hancock Bank on September 4, 2009 (Dkt. No. 325); and Continental Casualty Company on September 11, 2009 (Dkt. No. 327).

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K). Notice of the Trial was proper under the circumstances.

## Parties to the Action

A brief description of the parties involved in this Adversary is provided here to facilitate a better understanding of this lien priority dispute:

### A. Debtor

John Shavers is the Debtor in this bankruptcy case.

### B. Judgment Creditors

Ann Shavers, Stelly, and Koerber (sometimes referred to herein collectively as the "Judgment Creditors") have each obtained judgments against John Shavers and have caused their judgments to be enrolled in The Judgment Roll by the Clerk of the Circuit Court of Harrison County, Mississippi.

#### 1. Ann Shavers

Ann Shavers married John Shavers on June 8, 1968. Ann Shavers filed for divorce in January, 1999 and after two years of litigation was granted a divorce on September 7, 2001, on grounds of habitual cruel and inhuman treatment. See Shavers v. Shavers, 982 So. 2d 397 (Miss. 2008); (Koerber Ex.1).[7] As part of the divorce settlement, John Shavers was awarded the marital home, referred to as the Bayou Residence. The proceeds from the sale of the Bayou Residence are the subject of this Adversary.

_____

[7]All exhibit numbers refer to exhibits introduced into evidence at Trial, unless otherwise specified.

### 2. Stelly

Stelly is an attorney licensed to practice law in Mississippi.  Stelly and Scott Gibson, who is also a licensed Mississippi attorney, represented Ann Shavers in her divorce action against John Shavers. John Shavers sued Stelly for alienation of affection, and Stelly obtained a jury verdict against John Shavers on counterclaims for intentional infliction of emotional distress and placing Stelly in a false light in the public eye.  (Stelly Ex. No. 2).

### 3. Koerber

Koerber is a certified public accountant whose area of expertise includes the valuation of marital estates in domestic cases.  The chancellor appointed him as an expert in the divorce action between John Shavers and Ann Shavers. The Shavers' marital estate "involved six corporations, real property, investments, and other assets." (Koerber Ex. No. 1).

### C.  Ariana Shavers

Ariana Shavers is the minor child of John Shavers, born during the pendency of the divorce proceedings, but not the child of Ann Shavers.  After his divorce from Ann Shavers (but before enrollment of the judgments obtained against John Shavers by the Judgment Creditors), John Shavers transferred the Bayou Residence to his divorce attorney, B.G. Perry, in his capacity as custodian of the property for the benefit of Ariana Shavers.  (Ann Shavers Ex. 3).  The transfer, made pursuant to the Mississippi Uniform Transfers to Minors Act ("MUTMA"), Miss. Code Ann. §§ 91-2-1 to 91-20-49, created a custodianship in which B.G. Perry held the property for  the benefit of Ariana Shavers.[8]

_____

[8] MUTMA is best described as a form of statutory trust or guardianship.  Its purpose is to provide an inexpensive, easy way for giving property to minors, without having to engage in complicated legal transactions.  A custodian holds, manages, invests, and dispenses the custodial property for the benefit of the child during the child's minority but must deliver the property, and any proceeds, to the child when he or she reaches the age of 21. Miss. Code Ann.  § 91-20-41.

On August 6, 2003, John Shavers filed a voluntary petition for chapter 7 bankruptcy in this Court on behalf of Ariana Shavers, with B.G. Perry identified as her attorney.  (Case No. 03-53855, Dkt. No. 1).   Ariana Shavers was then only two years old.  (Case No. 03-53855, Dkt. No. 8).  The initial Schedules filed in Ariana Shavers's bankruptcy case identified her as the fee simple owner of the Bayou Residence and listed its estimated value as $1.2 million.

### D.  Bankruptcy Trustees

#### 1.  Murray

Murray was the court-appointed chapter 7 trustee for the bankruptcy estate of John Shavers. (Case No. 03-55729, Dkt. Nos. 66, 67). Murray initiated this Adversary to recover the Bayou Residence allegedly transferred to Ariana Shavers fraudulently by her father, John Shavers.  ( Dkt. No. 1).

#### 2.  Smith

Smith was the chapter 7 trustee in Ariana Shavers's bankruptcy case.  (Case No. 03-53855, Dkt. Nos. 50, 119).

### E.  Bank / Lien Creditor

Chase is the servicer of a $500,000 loan made on September 6, 2002, to John Shavers, who defaulted on the loan on April 1, 2003.  The loan was originally made by  Long Beach Mortgage Company ("Long Beach"), a Delaware corporation with its principal place of business in California. (Chase Ex. 3).   To secure the loan, John Shavers executed a deed of trust in favor of Long Beach on the Bayou Residence.

Washington Mutual Bank ("WaMu") succeeded to the interests of Long Beach, but during the pendency of this proceeding, was declared insolvent and went into receivership.  (Dkt. No. 285).

Chase purchased many of the assets of WaMu, including the servicing rights for the subject loan. (Chase Exs. 14, 15). An Agreed Order entered by this Court on January 29, 2009, substituted Chase in place of WaMu as the real party in interest.[9] (Dkt. No. 286). Chase filed a proof of claim in the bankruptcy case seeking $498,967.11, the principal balance due on the loan, plus interest. (Case No. 03-55729, Claim No. 30).

## Court Proceedings

### A. State Court

The divorce proceedings between Ann Shavers and John Shavers directly resulted in two judgments against John Shavers and indirectly led to a third judgment against him. (Koerber Ex. 1) The Chancery Court of Harrison County, Mississippi rendered two of the three judgments. The Circuit Court of the same county entered the third judgment.

### 1. $93,946.51 Awarded to Ann Shavers

On November 26, 2001, the chancellor entered an order requiring John Shavers to pay Ann Shavers $93,946.51 in attorney's fees she incurred in the divorce proceedings (the "Ann Shavers Judgment"). (Ann Shavers Ex. 4). Ann Shavers seeks that amount plus 8 per cent interest, up to $100,000, an amount fixed by Consent Judgment. (Adv. Proc. No. 04-05123, Dkt. No. 5; Case No. 03-55729, Claim No. 32-1).

### 2. $48,531.67 Awarded to Koerber

In the same order that awarded Ann Shavers her attorney's fees, the chancellor awarded Koerber $31,295 for services rendered in the valuation of the marital estate, $1,667.08 in interest on

---

[9] The Motion to Substitute filed by WaMu provides the history of assignments and/or transfers of the subject loan. (Dkt. No. 285).

unpaid invoices, and $15,569.59 in attorney's fees he incurred in the divorce proceedings (the "Koerber Judgment"). (Koerber Ex. 1). Koerber seeks $48,531.67 and, in addition, 8 per cent interest from the date of the judgment until paid. (Case No. 03-55729, Claim No. 24; Koerber Exs. 6, 8).

### 3. $250,000 Awarded to Stelly

On July 29, 2002, Stelly obtained a jury verdict and was awarded a judgment in the Circuit Court of Harrison County, Mississippi, on his counterclaim against John Shavers for intentional infliction of emotional distress and placing Stelly in a false light in the public eye in the amount of $250,000. (the "Stelly Judgment"). (Stelly Ex. 2; Case No. 03-55729, Claim No. 20). Stelly seeks that amount plus interest at the rate of 8 per cent from the date of the judgment until paid. (Pre-trial Order, Dkt. No. 320).

### B. Bankruptcy Court

On August 5, 2003, an involuntary petition under chapter 11 was filed against John Shavers in the Eastern District of Louisiana. (Case No. 03-15899, Dkt. No. 1). One day later, on August 6, 2003, John Shavers filed a voluntary chapter 7 petition on behalf of Ariana Shavers in this Court. (Case No. 03-53855, Dkt. No. 1). The bankruptcy case of John Shavers was transferred to this Court on November 21, 2003. (Case No. 03-55729, Dkt. No. 1). His case was converted to a chapter 7 on January 9, 2004, and Murray was appointed as chapter 7 trustee. (Case No. 03-55729, Dkt. Nos. 66, 67).

### 1. Fraudulent Conveyance Claim

The Complaint filed by Murray in this Adversary alleged that John Shavers and his former wife, Ann Shavers, owned the Bayou Residence until July 17, 2001, when Ann Shavers transferred

her one-half interest in the residence to John Shavers by special warranty deed. The Bayou Residence was encumbered by a deed of trust in favor of BancorpSouth Bank ("BancorpSouth"), which secured an indebtedness of approximately $265,000.

On November 1, 2001, John Shavers transferred the Bayou Residence to his divorce attorney, B.G. Perry, in his capacity as custodian of the property for the benefit of his minor daughter, Ariana Shavers pursuant to MUTMA, Miss. Code Ann. § 91-20-19.[10]  (Ann Shavers Ex. 3).  On September 6, 2002, B.G. Perry, as custodian of the property, executed a warranty deed transferring the property back from Ariana Shavers to John Shavers. (Ann Shavers Ex. 7).  On that same day, John Shavers borrowed $500,000 from Long Beach and executed a deed of trust on the Bayou Residence in favor of Long Beach to secure the debt. (Chase Exs. 3, 4).  On September 23, 2002, John Shavers transferred the residence back to B.G. Perry, as custodian of the property for Ariana Shavers. (Ann Shavers Ex. 9). On the date of the filings of both bankruptcy petitions, Ariana Shavers was the record title owner of the Bayou Residence.

Murray requested in the Complaint that the transfer to Ariana Shavers be avoided pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), 551, and Miss. Code Ann. § 15-3-3.  He alleged that the transfer occurred at a time John Shavers was under "increasing pressure by . . . creditors." (Dkt. No. 1). Smith filed his Answer, Counterclaim, and Crossclaim on April 14, 2004, naming the other parties to this proceeding and asking the Court to determine the validity, extent, and priority of certain liens against the Bayou Residence pursuant to Rules 7001, 7003, and 7019 of the Federal Rules of

---

[10] Transfer of real property into a custodianship is exceptionally simple; it is completed by merely recording ownership in the following form: "[Name of Custodian], as custodian for (name of minor) under the Mississippi Uniform Transfers to Minors Act."  Miss. Code Ann. § 91-20-13(1)(e).  A transfer under MUTMA is "by irrevocable gift to . . . a custodian for the benefit of a minor." Miss. Code Ann. § 91-20-9.

Bankruptcy Procedure.[11]  (Dkt. No. 3).

On July 9, 2004, this Court entered a judgment approving a settlement reached between the bankruptcy estates of John Shavers and Ariana Shavers in which both trustees agreed to avoid the transfer of the Bayou Residence made on September 23, 2002, by John Shavers to B.G. Perry as custodian for Ariana Shavers pursuant to 11 U.S.C.§ 548.  (Dkt. No. 20).  This settlement allowed the property to be administered by Murray on behalf of John Shavers's bankruptcy estate.

On October 26, 2004, this Court entered a consent order dismissing Smith as a party and substituting Murray as the sole plaintiff against the cross-claimants.  (Dkt. No. 43).  Ultimately, Murray sold the Bayou Residence and deposited sales proceeds in the amount of $534,314.95 with the Clerk of this Court where the funds remain today.  (Dkt. No. 229).   By consent order, this Court dismissed Murray from this action.  (Dkt. No. 225).  What remains in issue is the validity, extent, and priority of liens against these sales proceeds.

### 2.  Lien Ranking Claim

In his Crossclaim, Smith requested that this Court enter judgment declaring that on the date of Ariana Shavers's bankruptcy petition, the Bayou Residence was encumbered by the following liens in the following order of priority:[12]

(1.) Judgment in favor of Ann B. Shavers,
(2.) Judgment in favor of James Koerber,
(3.) Judgment in favor of Herbert Stelly, and
(4.) Deed of trust in favor of Long Beach Mortgage Company.

---

[11] This Adversary is more in the nature of an interpleader under Rule 7022 of the Federal Rules of Bankruptcy Procedure.

[12] Smith ranked a federal tax lien filed on April 17, 2001, in the amount of $9,262.50 in first position, but this lien has already been satisfied, and as previously noted, the IRS has been dismissed as a party in the Adversary. (Dkt. No. 14).

Smith based his lien ranking on the following facts gleaned from court records.  On November 1, 2001, John Shavers transferred the Bayou Residence to a custodianship for his daughter Ariana Shavers pursuant to MUTMA, Miss. Code Ann. § 91-20-13(1)(e).  On the date of the transfer, the property was encumbered by the first deed of trust lien of BancorpSouth in the amount of $264,478.31.

Before Ariana Shavers transferred the Bayou Residence back to her father, John Shavers, both the Ann Shavers Judgment and the Koerber Judgment were enrolled on January 4, 2002, and the Stelly Judgment, seven months later on August 5, 2002.  On September 6, 2002, B.G. Perry, as custodian of the Bayou Residence for Ariana Shavers, transferred the property back to John Shavers. At that time, the outstanding judgment liens against John Shavers attached to the Bayou Residence. (Dkt. No. 3).  On that same date, September 6, 2002, John Shavers executed a promissory note in favor of Long Beach for $500,000, which was secured by a deed of trust on the Bayou Residence property.  Long Beach paid off the BancorpSouth deed of trust lien and disbursed the remaining funds to John Shavers.  On September 23, 2002, John Shavers transferred the Bayou Residence back to B.G. Perry, as custodian of the property for the minor, Ariana Shavers.

The facts are largely undisputed by the Judgment Creditors and Chase.  However, everyone except Ann Shavers presents reasons why the lien ranking set forth in Smith's Crossclaim is incorrect.

### a.  Stelly

Stelly contends that the order of lien priority is Koerber, Stelly, Ann Shavers, and Chase. (Dkt. No. 5).  He argues that by agreement of the parties, Koerber's lien is senior to the lien of Ann Shavers and that Ann Shavers forfeited the priority of her lien to Stelly's junior lien when she failed

to levy execution for the satisfaction of her judgment. Miss. Code Ann. § 11-7-193.

### b. Koerber

Koerber's position mirrors Stelly's. He insists that the order of lien priority is: Koerber, Stelly, Ann Shavers, and Chase. Koerber claims that Ann Shavers lost her lien priority to him because of representations made by her attorney during the long course of this litigation. He further alleges that Ann Shavers lost her priority to Stelly by failing to proceed toward collection after Stelly gave statutory notice to her. (Dkt. No. 6).

### c. Ann Shavers

Ann Shavers, understandably, is satisfied with the lien priority set forth by Smith: Ann Shavers, Koerber, Stelly, and Chase. She argues that her judgment was enrolled first and that she should not be bound by her previous attorney's ambiguous representations. Also, "[b]ecause there was no levy by a junior judgment creditor, Miss. Code Ann. § 11-7-193 does not operate to affect the lien priority status in existence." (Dkt. No. 9).

### d. Chase

Unhappy with its last-place position in Smith's lien ranking, Chase asks this Court to depart from Mississippi's "race-notice" statutory scheme by applying the doctrine of equitable subrogation. (Dkt. No. 13). Chase seeks to substitute itself in place of BancorpSouth and thus acquire a senior lienholder status, but only to the extent of $264,478.31, the original principal amount of BancorpSouth's lien.[13] In other words, Chase does not seek to subrogate the entire loan balance due, $498,967.11, but, rather, asks this Court to bifurcate the lien priorities by giving first priority to the

---

[13] Chase does not, however, deduct from this amount the monthly payments of $4,536.36 made by John Shavers before he defaulted on the loan. (Chase Ex. 2).

funds its loan replaced and fourth (or last) priority to the remaining outstanding loan balance.  In addition to $264,478.31, Chase seeks first lien priority for the following: (1.) interest in the amount of $146,725.92, calculated at a rate of 10.4 per cent, accruing from the date of default on April 1, 2003, through July 29, 2008; (2.) late fees in the amount of $9,994.84; (3.) reimbursement for payment of ad valorem taxes and insurance in the amount of $34,855.11; (4.) miscellaneous fees in the amount of $1,470.50; and (5.) attorney's fees and expenses (through June 30, 2008) in the amount of $289,022.96. (Dkt. No. 320; Chase Ex. 13).  Thus, Chase seeks first lien priority in the total amount of $746,547.64, plus additional interest and fees until paid. (Chase Ex. 13).

## Chronology of Events

Much of the factual background leading up to this proceeding is not in dispute by the parties and may be gleaned from loan documents, court files, pleadings, orders, and stipulations of the parties to this Adversary.  Most of the trial testimony focused upon the events that took place at the loan closing on September 6, 2002, and those that happened immediately before and after that date. Three events that took place in quick succession on that day are of particular significance to this lien ranking dispute: (1) B.G. Perry, as custodian of the Bayou Residence for the benefit of Ariana Shavers, transferred the property to John Shavers; (2) the judgment liens of Ann Shavers, Koerber, and Stelly attached to the Bayou Residence; and (3) Long Beach loaned John Shavers $500,000, secured by a deed of trust on the Bayou Residence.  These events and others are discussed in greater detail below, some of which may have been mentioned previously.

### A. Acquisition of Bayou Residence

On June 12, 1995, John Shavers and Ann Shavers acquired their marital home, the Bayou Residence, which was financed by a promissory note from Bank of Mississippi in the amount of

$350,000.  They also executed a deed of trust on the property in favor of Bank of Mississippi. The deed of trust was recorded on June 22, 1995, by the Clerk of the Chancery Court in Harrison County, Mississippi. (Chase Ex. 7).  Bank of Mississippi became BancorpSouth, and BancorpSouth renewed and extended the loan twice on the same terms as the original note.  The last renewal took place on June 30, 2000, with a total loan amount of $281,208.73, payable in monthly installments of $3,644.01 at an interest rate of 9.5 per cent per annum and a balloon payment due at maturity on July 5, 2002. (Chase Ex. 8).

### B.  Divorce

John Shavers and Ann Shavers reached a settlement regarding the division of their marital assets, and pursuant to the settlement, Ann Shavers transferred her one-half interest in the Bayou Residence to John Shavers on July 17, 2001. (Dkt. No. 1). On September 7, 2001, following a long, bitter legal battle, the chancellor awarded Ann Shavers a divorce from John Shavers and incorporated the terms of the parties' settlement agreement into the divorce decree.  (Koerber Ex.1). The chancellor reserved issues of attorney's fees and payment for Koerber's accounting services for decision at a later time.  (Koerber Ex.1).

### C.  Bayou Residence Conveyed to Ariana Shavers

On November 1, 2001, John Shavers conveyed the Bayou Residence to his attorney, B.G. Perry, as custodian for his infant daughter, Ariana Shavers, under the provisions of MUTMA. (Ann Shavers Ex. 3)   The home was still subject to the deed of trust lien from BancorpSouth at the time of the transfer.

### D.  Enrollment of Judgments

Before September 6, 2002, the date John Shavers borrowed $500,000 from Long Beach, three

judgments were entered against him and were enrolled in The Judgment Roll by the Circuit Clerk of Harrison County, Mississippi, where the Bayou Residence was located.[14]  Notably, John Shavers did not own the Bayou Residence at the time these judgments were entered and later enrolled.

On January 4, 2002, at 8:29 a.m., a certified abstract of the Ann Shavers Judgment was enrolled.  (Ann Shavers Ex. 4).  For unknown reasons, the Ann Shavers Judgment was enrolled a second time on January 18, 2002.  (Chase Ex. 16).  On January 4, 2002, at 9:14 a.m., the Koerber Judgment was enrolled.  (Koerber Ex. 3; Ann Shavers Ex. 4; Chase Ex.16). Finally, on August 5, 2002, the Stelly Judgment was enrolled.  (Stelly Exs.1, 6; Ann Shavers Ex. 5).

**E.  Bank Loan**

On September 6, 2002, the date of the loan closing, several important transactions took place, the specific order of which is unknown. John Shavers signed a Uniform Residential Loan Application form[15]  (the "Loan Application").  (Chase Ex. 1).   B.G. Perry, as custodian of the property for the minor child, Ariana Shavers, transferred the Bayou Residence to John Shavers. (Ann Shavers Ex. 7). John Shavers executed a promissory note in which he agreed to pay Long Beach $500,000 in monthly installments of $4,536.36, at a fixed interest rate of 10.5 per cent per annum for two years and thereafter at an adjustable interest rate with a 30-year maturity date of October 1, 2032.  (Chase Ex. 2). He also executed a deed of trust in favor of Long Beach on the Bayou Residence to secure the loan.

In order to facilitate the loan closing on September 6, 2002, several key events occurred

_____

[14] Apparently, Hurricane Katrina destroyed the Bayou Residence in 2005.

[15] The form resembles Fannie Mae Form 1003, the form used by lenders to record financial information about an applicant who applies for a conventional single-family mortgage.

before and after that date:

### 1. Before Loan Closing on September 6, 2002

On August 27, 2002, First American Credco supplied Long Beach a merged credit report[16] (the "Credit Report"). (Chase Ex. 6). On August 29, 2002, a commitment for title insurance was issued by United General Title Insurance Company ("United General") to Long Beach for $500,000 on the Bayou Residence that stated, "On the effective date hereof, the estate described herein to be insured is Fee Simple and vested in: John E. Shavers." The effective date was listed as August 29, 2002, at 3:00 a.m. [sic]. (Stelly Ex. 9).

On August 30, 2002, Patricia Champagne ("Champagne") issued a title opinion letter to Elite Title Company ("Elite Title"). John Shavers retained Champagne, a Mississippi attorney, to examine title to the Bayou Residence "for the purpose of obtaining mortgagee title insurance in the amount of $500,000 in favor of Long Beach . . . ." (Chase Ex. 5; Ann Shavers Ex. 6). In her letter, Champagne wrote that the date and time of her examination of title was August 29, 2002, at 3:00 p.m. Also, contrary to United General's commitment, Champagne noted that, "B.G. Perry, as Custodian for the minor Ariana Lynn Shavers, under the Mississippi Uniform Transfers to Minors Act, is the owner of the subject property . . . ." (Chase Ex. 5; Ann Shavers Ex. 6).

### 2. After Loan Closing on September 6, 2002

On September 11, 2002, Elite Title paid off the first mortgage lien of BancorpSouth in the amount of $264,478.31, from the loan proceeds paid by Long Beach. (Chase Ex. 9). Also on that same date, Elite Title issued a check payable to "John E. Shavers" in the amount of $191,692.26,

---

[16] The document is entitled "MERGED PROFILE REPORT," but the parties at Trial referred to it as a merged *credit* report, so this Court will do so as well.

from the loan proceeds. (Chase Ex.10).  On September 12, 2002, a Warranty Deed indicating the transfer of property from B.G. Perry, as custodian for the minor Ariana Shavers to John Shavers on September 6, 2002, was filed with the Chancery Clerk of Harrison County.  (Ann Shavers Ex. 7).

On September 23, 2002, John Shavers conveyed the Bayou Residence back to B.G. Perry, as custodian for Ariana Shavers.  The transfer was recorded in the Harrison County Chancery Clerk's Office on September 27, 2002.  (Ann Shavers Ex. 9).  On November 20, 2002, United General issued a policy insuring Long Beach in the amount of $500,000 on the deed of trust dated September 6, 2002, on the Bayou Residence.  (Stelly Ex. 8).  On April 1, 2003, John Shavers defaulted under the terms and conditions of the loan.  (Dkt. No. 320).

### Discussion

Before reaching the gravamen of the issues in this proceeding, the Court must first acknowledge the overall legal framework within which various competing liens must be considered. The common-law rule regarding interest in property gives the highest priority to the first interest created in the property.  See Richard R. Powell & Patrick J. Rohan, Powell on Real Property § 82.01. This rule, commonly known as "first in time, first in right," is based on the principle that once a seller conveys his interest, he has nothing left to convey because he cannot give what he no longer owns. Id.

Mississippi's recording law, Miss. Code Ann. §§ 89-5-1 to 89-5-45, changes the common-law rule by giving a buyer a way of protecting his interest. Mississippi subscribes to a "race-notice" system that allows a grantee recording an interest to take priority over someone with a senior interest, but only if he lacks notice of the prior, unrecorded interest.  See Kelly v. Shoemake, 460 So. 2d 811, 822-23 (Miss. 1984).  The "race" aspect is an application of the "first in time, first in right" common-

law rule; the "notice" aspect refers to a situation where a buyer has actual knowledge of a prior conveyance.[17]

When a buyer records an interest (such as a deed of trust) without notice of any prior unrecorded interest, he has the better right or priority as to all later recorded interests, regardless of when the conveyances actually occurred. Miss. Code Ann. § 89-5-3. The resulting rule is that the first recorded interest has priority over all subsequently recorded interests. In this way, Mississippi's race-notice system assures a buyer who searches the public records that the interest he is about to receive is paramount–by providing subsequent purchasers of land with constructive notice of prior conveyances and by giving him priority over successive buyers.

Mississippi recording laws apply with as much force to judgment creditors as they do to buyers. See Burkett v. Peoples Bank of Biloxi, 83 So. 2d 185 (Miss. 1955). However, the statutes require different procedures for recording different types of liens. A deed of trust, for example, creates a type of consensual lien that attaches to specific real property and is recorded with the clerk of the chancery court in the county where the property is located. Miss. Code Ann. § 89-5-3. The chancery clerk must record deeds and other instruments in the order in which they were filed and must enter the date, hour, and minute each document was presented for recording. Miss. Code Ann. § 89-5-25.

In contrast to a deed of trust, a judgment lien is a type of non-consensual or involuntary lien created by statute. Mitchell v. Wood, 47 Miss. 231, 233-34 (1872). In Mississippi, a judgment lien constitutes a general lien on all of the real property and intangible personal property that a judgment

---

[17] For a basic introduction to recording statutes in the United States, see John H. Scheid, Down Labyrinthine Ways: A Recording Acts Guide for First Year Law Students, 80 Univ. Det. Mercy L. Rev. 91 (2002).

debtor owns or later acquires within the county where the judgment is enrolled. Miss. Code Ann. § 11-7-191; Motors Sec. Co. v. B.M. Stevens Co., 83 So. 2d 177, 179 (Miss. 1955); Cooper v. Turnage, 52 Miss. 431, 433 (1876). In order to acquire such a lien, the judgment creditor must comply with the statutory mechanism provided for its creation. He must obtain a certified abstract of the judgment from the clerk of the court in which it was rendered, Miss. Code Ann. § 11-7-195, 11-7-197, and enroll it in "The Judgment Roll" book or books maintained by the circuit clerk in the county in which the property is located. Miss. Code Ann. § 11-7-189(1). The clerk must enter on the Judgment Roll, in alphabetical order, the name of each defendant to the judgment and must include additional information, such as the amount of the judgment, the date of rendition, and the date, hour, and minute of enrollment. Miss. Code Ann. § 11-7-189.

As a means of self-protection, a refinancing lender will usually order a title examination to ensure that no intervening interests exist between, for example, an old first trust deed and a new trust deed. If properly performed, a search of all public records in both the chancery and circuit clerks' offices in the county where the land is situated generally should reveal whether the owner in fact, has clear title to the property with the right to convey it. See Powell, supra at § 82.01.

## A. Chase v. Judgment Creditors

Under the normal lien priority system, a judgment creditor would be first in priority when an original deed of trust is refinanced. The release of the first priority deed of trust lien would allow the second priority judgment creditor to assume first priority, ahead of the refinancing lender. Chase has asked this Court to alter the lien priorities by applying the doctrine of equitable subrogation so that Chase, as the successor to the refinancing lender, would take first priority over all the Judgment Creditors, even though they enrolled their liens first.

### 1. Equitable Subrogation

Although most states that have addressed equitable subrogation in the residential mortgage loan context analyze the same issues, jurisdictions apply the doctrine with considerable variation. Because equitable subrogation is a state-law doctrine,[18] whether equitable subrogation applies in this case presents a question of Mississippi law, for which there is limited authority. Where Mississippi law is lacking, its courts have looked to the law of other jurisdictions for guidance. See Robison v. Lanford, 841 So. 2d 1119, 1124-25 (Miss. 2003) (looking to decisions in Louisiana, Georgia and Illinois). In accordance with this practice, this Court looks to the law of other states when necessary to supplement Mississippi's law on equitable subrogation. This Court acknowledges at the outset that decisions in this area of law generally are highly fact-specific, and there is no general rule to determine when the right of subrogation exists, since it depends upon the equities of each case.

Mississippi has long recognized the doctrine of equitable subrogation in the residential loan refinancing context.[19] As explained by the Mississippi Supreme Court, the concept is simple: "Subrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any rightful claim, so that he who is substituted succeeds to the rights of the other in

---

[18] State law subrogation is distinguishable from statutory subrogation under 11 U.S.C. § 509 of the Bankruptcy Code. Section 509 pertains to subrogation rights of sureties, co-debtors, or other entities that are liable with the debtor or that have secured a claim of a creditor. 11 U.S.C. § 509; 3 Collier on Bankruptcy ¶ 509.02 (15th ed. rev.). Chase does not fall within its provisions. Section 509, however, is not exclusive authority for equitable subrogation in bankruptcy proceedings and, therefore, does not preempt equitable subrogation under state law in other contexts. In re Missionary Baptist Found. of Am., Inc., 667 F.2d 1244 (5th Cir. 1982).

[19] See, e.g., Ligon v. Barton, 40 So. 555 (Miss. 1906). Mississippi courts have applied equitable subrogation in other, more familiar contexts. See, e.g., Federated Mut. Ins. Co. v. McNeal, 943 So. 2d 658 (Miss. 2006) (worker's compensation); Hare v. State, 733 So. 2d 277 (Miss. 1999) (health insurance).

relation to the debt or claim, and to its rights, remedies, or securities." Robertson v. Sullivan, 59 So. 846, 847 (Miss. 1912) (citations omitted). Thus, one of the basic principles of subrogation is that the party seeking the benefit of subrogation (the "subrogee") seeks to exercise its rights and remedies as a successor to the legal rights of the party who received the benefit of the payment (the "subrogor"). Simply put, the doctrine of subrogation allows the subrogee to "step into the shoes" of the subrogor. See St. Paul Prop. & Liab. Insur. Co. v. Nance, 577 So. 2d 1238, 1241 (Miss. 1991).

A more difficult issue arises in determining when to apply the equitable subrogation doctrine. In Mississippi, this doctrine applies, in general, "wherever any person other than a mere volunteer pays a debt or demand which in equity and good conscience should have been satisfied by another, or where one person finds it necessary for his own protection to pay the debt for which another is primarily liable . . . ." Prestridge v. Lazar, 95 So. 837, 838 (Miss. 1923). The object of equitable subrogation "is the doing of complete, essential, and perfect justice between all parties." Lyon v. Colonial United States Mortgage Co., 91 So. 708, 709 (Miss. 1922).

Beyond these basic principles of equitable subrogation law, there is disagreement among the Four Claimants as to the extent, if any, that Long Beach's knowledge of the intervening lien and Long Beach's negligence have on Chase's entitlement to relief. Also, the Four Claimants disagree as to whether and to what extent harm or prejudice to the Judgment Creditors will bar subrogation. Resolution of these issues requires a closer examination of the few cases in Mississippi that have applied this doctrine.

### a. Notice

In both of the Supreme Court's decisions in Prestridge and Tom Lyle Grocery Co. v. Rhodes,

Page 21 of 52

177 So. 777 (Miss. 1938), the purchaser of property, in order to clear its title of encumbrances, satisfied mortgages from the purchase money it paid to the landowner, only to learn later of another unsatisfied, but properly recorded lien on the same property.  Prestridge, 95 So. at 837; Tom Lyle, 177 So. at 777-78.  In both cases, the Court applied the doctrine of equitable subrogation.  Prestridge, 95 So. at 838; Tom Lyle, 177 So. at 778.  The cases differ only in that Prestridge involved an overlooked mortgage, whereas Tom Lyle involved an overlooked judgment lien.  In both cases, the purchaser of the property lacked actual knowledge of the missed liens, although both liens were properly recorded.

As these cases demonstrate, constructive notice, imputed from the existence of the recordation of a lien, apparently is insufficient in itself in Mississippi to defeat application of equitable subrogation.  Notably, only a few jurisdictions bar equitable subrogation when a lender's only knowledge of the intervening interest is constructive notice from the recording of that interest. See  In re Gordon, 164 B.R. 706 (Bankr. S.D. Fla. 1994) (Florida); Indep. One Mortgage Corp. v. Katsaros, 681 A.2d 1005 (Conn. App. Ct. 1996) (Connecticut); Bank of Canton v. Nelson, 160 S.E. 232 (Ga. 1931) (Georgia); Harms v. Burt, 40 P.3d 329 (Kan. Ct. App. 2002) (Kansas); Thompson v. Chase Manhattan Mortgage Corp., 90 S.W.3d 194 (Mo. Ct. App. 2002) (Missouri); Am. Gen. Fin. Servs., Inc. v. Barnes, 623 S.E.2d 617 (N.C. Ct. App. 2006) (North Carolina); Centreville Car Care, Inc. v. N. Am. Mortgage Co., 559 S.E.2d 870 (Va. 2002) (Virginia); Kim v. Lee, 31 P.3d 665 (Wash. 2001) (Washington). There is no indication that Mississippi would deviate from its previous decisions in Prestridge and Tom Lyle.  Moreover, to deny equitable subrogation upon proof that the lender overlooked a recorded encumbrance would effectively eviscerate the rule, a result that is inconsistent with the Mississippi Supreme Court's admonition in Prestridge that "courts should

rather incline to extend than restrict the operation of the doctrine." <u>Prestridge</u>, 95 So. at 838.

On the other hand, a majority of courts have held that actual, as opposed to constructive, knowledge will preclude equitable subrogation.  <u>See, e.g.</u>, <u>United States v. Baran</u>, 996 F.2d 25, 29 (2d Cir. 1993) (applying New York law); <u>Dietrich Indus., Inc. v. United States, 988 F.2d 568</u>, 572 (5th Cir. 1993) (applying Texas law); <u>Brooks v. Resolution Trust Corp.</u>, 599 So. 2d 1163, 1165 (Ala. 1992); <u>Smith v. State Sav. & Loan Ass'n</u>, 223 Cal. Rptr. 298, 301 (1985); <u>United Carolina Bank v. Beesley</u>, 663 A.2d 574, 576 (Me. 1995).  The reasoning underlying this approach is that a lender with actual knowledge of a junior lienholder cannot reasonably expect to step into the shoes of the previous creditor it paid off.  This approach is consistent with Mississippi law.[20]

### b. Negligence

Chase relies on the Mississippi Supreme Court's most recent application of the doctrine of equitable subrogation in <u>First National Bank of Jackson v. Huff</u>, 441 So. 2d 1317 (Miss. 1983), in support of its contention that negligence, regardless of degree, is immaterial as to application of the doctrine of equitable subrogation.  In <u>Huff</u>, a borrower assigned a deed of trust to a bank as security for a loan.  <u>Id</u>. at 1318. The borrower held the deed of trust as security on a promissory note arising out of the sale of certain residential property. <u>Id</u>. When he paid the loan to the bank in full, the bank mistakenly canceled the deed of trust, instead of the assignment, to the detriment of the borrower and without his consent or knowledge.  <u>Id</u>.

After the death of the obligor on the deed of trust, his widow stopped paying on the note

---

[20] Some jurisdictions criticize this approach on the ground that it promotes willful ignorance.  <u>See, e.g.</u>, <u>Houston v. Bank of Am. Fed. Sav. Bank</u>, 78 P.3d 71, 73 (Nev. 2003).  This minority view fails to consider that a lender who does not obtain a title search may not qualify for equitable subrogation because of its culpable negligence.

because the borrower failed to probate his claim against the decedent's estate and the deed of trust securing the note had been cancelled.  Id. Consequently, the borrower sued the bank for negligence and obtained a judgment for the unpaid principal and interest on the deed of trust.  Id. at 1319.  The bank then sought to be subrogated to the borrower's rights to reinstate the deed of trust and initiate foreclosure proceedings.  Id. The trial court held that the bank was not entitled to equitable subrogation because of its negligence in erroneously canceling the deed of trust. Id. The Mississippi Supreme Court, however, reversed and remanded, holding that the bank could take the place of the borrower pursuant to the equitable subrogation doctrine, despite its own negligence.  Id. at 1320.

Chase cites Huff for its conclusion that in situations where no one would be prejudiced or injured by application of the doctrine of equitable subrogation, "negligence of any sort is entirely immaterial" in Mississippi.  (Trial Br. of WaMu, Dkt. No. 257 at 7, 9).  Chase lifts this language from a parenthetical that appears at the end of a string citation of cases in support of the  Huff Court's position that "some other jurisdictions do not bar the application of subrogation for negligence alone." Huff, 441 So. 2d at 1319-20.  The language that Chase relies upon  appears after the last authority, a treatise on the law of mortgages.  Id. The Huff Court, however, did not adopt the position that negligence of any degree is immaterial, but rather limited its holding to negligence that is "ordinary." Id. at 1320.  To conclude otherwise is too big a leap.  Moreover, contrary to Chase's description of Mississippi law, the Huff Court cites its earlier decision in Lyon as authority for its contention that subrogation cannot be granted to a party whose own wrongful conduct created the need for such relief.  Huff, 441 So. 2d at 1319.

In Lyon, the Mississippi Supreme Court denied subrogation to a mortgage company that had granted a mortgage under the mistaken belief that a widow owned property free of any interests of

her husband's children from a previous marriage. <u>Lyon</u>, 91 So. at 709. The children successfully sued the widow and mortgage company for partition and sale of the property. <u>Id</u>. at 708. Shortly after the filing of the suit, the widow leased the property to lessees who were informed of the children's interest in the property and the pending litigation. <u>Id</u>. at 709. The widow and mortgage company lost their appeal of the order granting partition. <u>Id</u>. When the property was sold, the portion of rent under the lease attributable to the children's interest was ordered to be paid out of the widow's share of the sale proceeds. <u>Id</u>. Nevertheless, the mortgage company filed suit against the lessees, seeking to be subrogated to the children's share of the rent. <u>Id</u>. The Mississippi Supreme Court held that to force the lessees under those circumstances to pay the same rent twice in order to relieve the mortgage company "from the consequences of its own wrong" would be inequitable. <u>Id</u>.

Chase's view of Mississippi law, as least in so far as the role of negligence in subrogation matters, is too expansive, as shown by the <u>Lyon</u> decision. Although the doctrine is constantly evolving, there is no authority that overrules <u>Lyon</u>. Beyond that, there is no authority that indicates that Mississippi would adopt the highly liberal approach urged by Chase, as articulated in the Restatement (Third) of Property: Mortgages § 7.6 (2009), that subrogation should be applied in all circumstances unless there is affirmative proof that the refinancing lender intended to subordinate its lien.

### c.  Harm or Prejudice

It is clear under Mississippi law that the doctrine of equitable subrogation, as its names suggests, is a doctrine based on equity. As the Court explained in <u>Lyon</u>, it "is a creation of the court of equity, and is applied, in the absence of an agreement between the parties, where otherwise there would be a manifest failure of justice." <u>Lyon</u>, 91 So. at 709 (citation omitted). For this reason, the

doctrine "will not be applied unless the applicant's cause is just and innocent persons will not be injured thereby." Id.

### 2. Application of Equitable Subrogation

In light of the foregoing cases, it is reasonable to conclude certain elementary principles of Mississippi law on this subject. First, constructive notice will not *per se* bar application of equitable subrogation, although actual notice of an intervening lien will. Tom Lyle, 177 So. 778; Prestridge, 95 So. 838. Second, culpable negligence, or wrongful conduct, by the party seeking equitable subrogation will bar application of the doctrine. Huff, 441 So. 2d at 1319. Third, prejudice or injury to the intervening lienholder will bar application of the doctrine. Lyon, 91 So. at 709.

The evidence presented at Trial showed that Long Beach loaned money to John Shavers for the purpose, *inter alia*, of paying off BancorpSouth's deed of trust, that a portion of the loan proceeds were used for this purpose, and that Long Beach expected to maintain an interest in the Bayou Residence equivalent to the lien of the discharged deed of trust. Thus, Chase has met the initial elements of equitable subrogation. Ultimately, whether Chase is entitled to be equitably subrogated to the first priority position of BancorpSouth depends on three issues: (1) whether Long Beach had actual knowledge of the existence of the intervening judgment liens; (2) whether Long Beach's lack of actual knowledge was the result of its culpable negligence; and (3) whether the Judgment Creditors will suffer substantial harm by the allowance of equitable subrogation. An affirmative response to any one of these issues will bar equitable subrogation.

### a. Did Long Beach Have Actual Notice of the Judgment Liens?

The evidence at Trial demonstrated that the judgment liens were properly enrolled in The Judgment Roll of Harrison County at the time of the loan closing. The evidence also demonstrated

that none of the documents relied upon by Long Beach in granting the loan to John Shavers disclosed the existence of the liens.   The Judgment Creditors contend that Long Beach not only had constructive notice because of the enrollment of the liens, but also had actual notice because Michelle Rodriguez ("Rodriguez"), an attorney licensed to practice law in Louisiana, knew about the liens at the time of the loan closing.

Rodriguez is president and owner of Elite Title, an agency that handles title and real estate closings in Mississippi and Louisiana.  Her company, Elite Title, handled the subject loan closing.[21] The Judgment Creditors impute her knowledge to Long Beach (and now Chase) because of the alleged agency relationship (a) between Long Beach and  Elite Title; (b) between Elite Title and United General, the title insurance underwriter, and/or (c) between Long Beach and United General. Before engaging in the circuitous route presented by the agency issue, this Court must first determine whether the evidence at Trial demonstrated that Rodriguez did indeed know about the liens at or before the loan closing.

Rodriguez testified at Trial that she first learned about the judgment liens in November, 2002, as a result of a title search performed by Elite Title in anticipation of a loan closing that involved other property owned by John Shavers.  She was not present at the September 6, 2002, loan closing that is the subject of this dispute and explained that as a matter of  practice, she did not become personally involved in any loan transaction under $1 million.

To contradict her testimony, Stelly offered his own testimony and the testimony of Gibson. Gibson, a licensed Mississippi attorney, assisted Stelly in his representation of Ann Shavers during her divorce proceedings and also defended Stelly in the alienation of affection claim filed against

---

[21] Rodriguez testified that Elite Title no longer conducts business in Mississippi.

him by John Shavers.  Gibson testified at Trial about a telephone conversation he had with Rodriguez sometime in November, 2002.  Stelly was present in Gibson's office and overheard their conversation over a speaker telephone.  Apparently, Gibson made the call after Stelly complained to him about Long Beach's failure to satisfy his judgment lien from the loan proceeds paid to John Shavers on September 6, 2002.

The testimony of Gibson and Stelly differs somewhat about what Rodriguez said.  According to Gibson, Rodriguez answered "yes" to his straightforward question about whether she knew about the judgment liens at the loan closing.  According to Stelly, Rodriguez said she knew about the liens in the context of a more general conversation about how Elite Title could have approved title to the Bayou Residence at the loan closing. When Gibson and Stelly were asked at Trial about whether they could have misunderstood Rodriguez's response, both testified that they were shocked by her cavalier attitude, and there was no room for misinterpretation.

Rodriguez strenuously denied telling Gibson that she knew about the judgment liens at the loan closing, but she admits telling him she became aware of the judgments sometime after the loan closing and prior to their telephone conversation. All three participants in the telephone conversation testified that Rodriguez said that she had spoken with John Shavers and he had agreed to pay all the judgment liens in January, 2003, from loan proceeds he expected to receive in a loan transaction that also involved Rodriguez's company, Elite Title.   Stelly testified that Rodriguez acknowledged that if John Shavers did not pay the judgments, then her company would "have to eat them." Understandably, Rodriguez denies making this last remark.

This Court finds that the testimony of Gibson and Stelly does not establish that Rodriguez had knowledge of the liens at the loan closing. Although this Court does not question the sincerity

of their belief that Rodriguez admitting knowing about the liens, this Court finds Rodriguez's version of what she said more credible. When Rodriguez told Gibson and Stelly she was aware of the liens, they did not press her to find out when she acquired that knowledge and they just assumed she meant sometime before the loan closing. This interpretation explains why Rodriguez seemed so flippant when answering their questions–because she did not say what they thought she said. Indeed, in Stelly's rendition of the telephone conversation, Rodriguez's response was ambiguous as to *when* she found out about the liens.

Because the Judgment Creditors did not meet their burden of proof as to whether Rodriguez had actual knowledge of the liens at or prior to the loan closing, it is unnecessary for this Court to consider whether her knowledge can be imputed to Long Beach. In that regard, however, it is worth noting that Rodriguez was not present at the loan closing.

### b. Was Long Beach's Lack of Actual Knowledge of the Judgment liens a Result of its Culpable Negligence?

The Judgment Creditors contend that Long Beach's lack of actual knowledge about the intervening liens was a consequence of its culpable negligence. Culpable negligence requires something more than ordinary negligence and generally involves a heightened indifference to, or disregard of, the consequences of one's actions. 65 C.J.S. Negligence § 19.

At Trial, Chase produced two witnesses, Tina Bell and Rodriguez, in support of its position that Long Beach's actions in relation to the loan did not constitute negligence, much less culpable negligence. Tina Bell ("Bell"), an attorney currently employed by Chase as a loan servicing research support analyst in its office in Jacksonville, Florida, testified at Trial that she is the corporate custodian of the records of WaMu, which were at one time the records of Long Beach and,

specifically, that she is the custodian of the records concerning the $500,000 loan from Long Beach to John Shavers. Bell never worked for Long Beach, was not present at the loan closing, did not know the identity of the employees who approved the loan, and had no personal knowledge about what happened at the loan closing other than what the loan file revealed. Bell testified that Long Beach relied upon three documents in loaning $500,000 to John Shavers: the Credit Report (Chase Ex. 6); the Loan Application of John Shavers (Chase Ex. 1); and a title abstract (Chase Ex. 5; Ann Shavers Ex. 6).

### i. Credit Report

Long Beach obtained the Credit Report from First American Credco ten days before the loan closing. (Chase Ex. 6). The Credit Report combined information obtained from three credit-reporting agencies. It did not disclose the existence of the judgment liens enrolled against John Shavers in the names of Ann Shavers, Koerber, or Stelly, but it did reflect eight other judgment liens enrolled against him, including an unreleased federal tax lien.[22] It also revealed the existence of numerous consumer debts, including several delinquent accounts.

### ii. Loan Application

John Shavers signed a Loan Application on the same day as the loan closing.[23] (Chase Ex.1). The Loan Application is not a font of financial information about John Shavers. Other than his employment and income, there is very little other information. It lists a market value on the

---

[22] Smith's Crossclaim noted that the Bayou Residence was subject to this federal tax lien, recorded April 17, 2001, in the amount of $9,262.50. (Dkt. No. 3). The federal tax lien has been satisfied. (Dkt. No. 14).

[23] There was no evidence presented at Trial indicating that John Shavers himself completed any part of the Loan Application or that the form was completed before or during the loan closing. However, no one disputes that John Shavers signed the Loan Application.

Bayou Residence of $925,000, with the amount of "Mortgages and Liens" shown as $263,046.75. It does not disclose either the existence of the judgments of Ann Shavers, Koerber, and Stelly or the existence of any of the judgments listed in the Credit Report. To the contrary, the "No" boxes are checked in response to the questions, "Are there any outstanding judgments against you?" and "Are you a party to a lawsuit?" (Chase Ex. 1). Also, under the heading "Liabilities," the Loan Application did not list any debts whatsoever, notwithstanding the numerous debts disclosed in the Credit Report. On the other hand, it did not list any information under the heading "Assets."

Bell acknowledged the discrepancy between the credit report, showing numerous obligations owed by John Shavers, and the Loan Application, indicating there were none. However, she refused to admit on cross-examination that the omissions should have raised a "red flag." She pointed out that the records did not indicate what instructions, if any, Long Beach may have given John Shavers in that regard. Also, there was a letter in the file signed by John Shavers in which he explained how he was going to use the "cash out" funds from the loan in the total amount of $191,692.26. (Chase Ex. 10).

> The "cash out" for my loan was going to pay off all of my personal debt including my auto with Toyota Motor. The total debt was $85,447.00, this will free up $2,654.00 every month. The remaining cash was going to be used for substantial upgrades to my private residence including but not limited to appliances, home audio and visual center and expanded workout facilities. The rest to be put into a savings account.

(Chase Ex. 11). Apparently, this letter constituted the only restriction on John Shavers's use of these funds. Bell testified that the total amount of debts listed in the Loan Application was close to the "cash out" amount, but there was no evidence presented at Trial indicating that John Shavers used the funds for this purpose. Notably, John Shavers did not apply any of these funds to the liens of the Judgment Creditors.

Finally, Bell acknowledged that a prudent lender would want to know whether it was lending money to a convicted felon, but the Loan Application did not request that information. According to Ann Shavers, John Shavers had spent time in federal prison while they were married.

### iii.  Title Examination

The title opinion of Champagne, dated August 30, 2002, was based upon her examination of title as of August 29, 2002.  (Chase Ex.5; Ann Shavers Ex. 6).  She testified that John Shavers retained her services to perform a title check on the Bayou Residence, and that even though she never spoke with anyone at Elite Title, she addressed her opinion to Elite Title because John Shavers asked her to do so.

Champagne readily admitted that her title examination did not reveal the liens of the Judgment Creditors.  She explained that B.G. Perry as custodian of the property for the minor child, Ariana Shavers, was the record owner of the Bayou Residence at the time of her examination, and, therefore, the three liens of the Judgment Creditors against John Shavers, who was not at that time the record owner of the Bayou Residence,  did not attach.[24]  In other words, the Judgment Creditors had no legal interest in the Bayou Residence at the time of her examination.

Champagne was not involved in the loan closing, had no other contact with Elite Title, and never had any contact at any time with Long Beach.  Specifically, she testified that neither John Shavers, Elite Title, nor Long Beach ever contacted her to update her title opinion.  Afterwards, she

---

[24]  In her handwritten notes, Champagne acknowledged the existence of a judgment that could have attached to the Bayou Residence because it was enrolled in 1987, before the property was transferred by John Shavers to B.G. Perry as custodian for Ariana Shavers.  (Ann Shavers Ex. 6).  She did not include the judgment lien in her title opinion because her notes showed that the statute of limitations had expired.  See Miss. Code Ann. § 15-1-47 (judgment lien expires after seven years unless renewed).

assumed that the loan to her client, John Shavers, had not been closed because of what her title search had revealed–that John Shavers did not own the Bayou Residence.

Rodriguez testified at Trial that at the time the loan was made to John Shavers, Elite Title's office manager, who was not an attorney, was in charge of the company's Mississippi operations. She admitted that Elite Title did not have a licensed Mississippi attorney at the company at that particular time and that it was unusual for the borrower, rather than for the lender, to obtain the title opinion.  She testified that her company ordinarily does not rely upon loan applications (which would only be part of the closing package) or credit reports (which they would not see), but instead would rely solely on the title opinion of a licensed attorney.

Rodriguez testified that the title opinion on the Bayou Residence was provided to Elite Title, but not requested by it, and that the deal seemed to have been handled quickly. She admitted that Champagne's title opinion, dated August 30, 2002, showed that B.G. Perry, was the custodian of the Bayou Residence for the minor child, Ariana Shavers, yet United General issued a policy commitment dated the previous day, August 29, 2002, stating that John Shavers was the property owner, when he was not.[25]  (Stelly Exs. 8, 9).

### iv.  Excusable Ignorance

Chase claims that Long Beach was completely justified in its reliance upon the title opinion, Credit Report, and John Shavers's own misrepresentations in the Loan Application, all of which failed to disclose the existence of the liens of the Judgment Creditors. Moreover, Chase contends that such reliance is undeniably reasonable in the lending industry.  For these reasons, Chase

---

[25] B.G. Perry, as custodian of the Bayou Residence for Ariana Shavers, did not reconvey the property to John Shavers until September 6, 2002.

describes Long Beach as "excusably ignorant" and deserving of being equitably subrogated to the first lien position. Chase cited three cases in its trial brief that it contends are analogous to the facts presented at Trial:  G.E. Capital Mortgage Services, Inc. v. Levenson, 657 A.2d 1170 (Md. 1995); Dodge City of Spartanburg, Inc. v. Jones, 454 S.E.2d 918 (S.C. Ct. App. 1995); and Metropolitan Life Insurance Co. v. Craven, 101 P.2d 237 (Ore. 1940).

In G.E. Capital, the Maryland Court of Appeals determined that G.E. Capital was equitably subrogated to the position of first priority when it refinanced an existing deed of trust and was unaware of the existence of several intervening judgment liens because of the borrower's failure to disclose those liens as liabilities in her loan application and also because the title examination on the property did not uncover them, presumably because the judgments were rendered against the borrower in her maiden name.  G.E. Capital, 657 A.2d at 1172.  The court determined that, unless the doctrine of equitable subrogation was invoked, the intervening judgment creditor would be unjustly enriched.

Chase contends, in effect, that G.E. Capital excuses lenders who rely on information provided by borrowers like John Shavers as to the status of their security.  That decision, however, does not reach so far.  The lender in G.E. Capital relied on a title opinion that also failed to disclose the liens. Chase would have this Court view the Loan Application in a vacuum, without regard to any other facts, but doing so would not be consistent with what happened here.  Although the evidence at Trial demonstrated that John Shavers misrepresented his financial status, dishonesty is not unheard of in lending transactions.  For this reason, a prudent lender would not rely solely on loan applications, and it is clear that Long Beach did not do so.

Chase also contends, and rightly so, that the failure of a title search to uncover prior liens

does not necessarily preclude application of the equitable subrogation doctrine to the lender who relied on it. In G.E. Capital, for example, the title search was faulty because of the borrower's habit of using variations of her different married and maiden names. The court in G.E. Capital did not find the lender culpably negligent because of its reliance on the title report.

In addition to G.E. Capital, Chase relies upon Dodge City and Metropolitan Life for its contention that Long Beach was excusably ignorant of the Judgment Creditors' liens. In Dodge City, the South Carolina Court of Appeals found in Dodge City that a lender who relied on a faulty title search was entitled to equitably subrogate an otherwise senior lienholder. Dodge City, 454 S.E.2d at 918-21. In that case, the borrowers executed a first mortgage in favor of First Federal Savings and Loan Association, recorded on August 7, 1984, and then executed a second mortgage in favor of Carolina Investors, Inc., recorded on November 18, 1986. Then, in April, 1988, Dodge City obtained a default judgment against the borrowers, which subsequently became a lien against the twice-mortgaged property. Id. at 919. In March, 1989, the borrowers executed a third mortgage with Carolina Investors, Inc. for an amount sufficient to pay off the first and second mortgages. The title search performed for Carolina Investors, Inc. failed to disclose the default judgment, although it was properly recorded at the time of the search. Id.

In February, 1993, Dodge City sought to enforce its judgment and moved for a sale of the mortgaged property. However, the court held that Carolina Investors, Inc. was equitably subrogated to the priorities of the first and second mortgages because it did not have actual notice of the prior default judgment due to its reliance on the faulty title search. Moreover, Dodge City was not injured by the subrogation since "it is in essentially the same position as it was at the time the Judgment was filed." Id. at 921.

Chase also relies upon <u>Metropolitan Life</u>, in which the Oregon Supreme Court held that the assignee of a mortgage that had discharged a prior first mortgage, after relying on a faulty title abstract and on the misrepresentations of the borrower, should gain priority over an intervening judgment lienholder through the doctrine of equitable subrogation.  The Oregon Supreme Court summarized its analysis:

> We think that where the holder of the junior lien will stand in the same position, if subrogation is allowed, as that in which he stood originally, and misrepresentation is made by the owner of the property to the effect that there is no junior lien, and the party advancing the money to defray the prior lien is not guilty of negligence, but secures an abstract from a reputable abstract company, submits the abstract to skilled attorneys and receives a report to the effect that it does not disclose any such junior lien upon the property involved, the right of substitution or subrogation to the priority of the prior lien is available.

<u>Metropolitan Life</u>, 101 P.2d at 241.  Chase contends that as in <u>Dodge City</u> and <u>Metropolitan Life</u>, Long Beach's actions in relying on a title search performed by a reputable title search company did not constitute culpable negligence.  At the outset, it is worth noting that these cases do not constitute binding authority on this Court, but more importantly, they are factually inapposite.

In <u>G.E. Capital</u>, <u>Dodge City</u>, and <u>Metropolitan Life</u>, all the lenders relied upon a title search that was defective in failing to disclose the existence of an intervening lien.  Unlike here, however, in those cases, the title search indicated that the borrower and the property owner were the same person.  Under these circumstances, the lender's reliance on a negligent title search did not constitute culpable negligence.  Chase argues that <u>Dodge City</u> and <u>Metropolitan Life</u> "are remarkably similar to the case at hand."  (Trial Br. of WaMu, Dkt. No. 257 at 16).  Chase's argument is misplaced because Champagne's title opinion was not faulty.

### v.  Culpable Negligence

When a title examiner performs a title search, she looks at all of the public records that may have a bearing on the title to the property being examined.  These records include the records which

reflect the succession of owners of the property, as well as any liens that may have been placed against the property either for loans secured by the property or for unpaid judgments against the property owner.

When Champagne issued her title opinion as to ownership of the Bayou Residence as of August 29, 2002, she found that title to the property was in the name of B.G. Perry as custodian for Ariana Shavers. Therefore, there was no reason for Champagne to search The Judgment Roll under John Shavers's name for unpaid judgments against him after the date that he no longer owned the Bayou Residence. Clearly, this is not a situation where a title examiner negligently overlooked an intervening lien while conducting a title search. Indeed, before opening arguments at Trial, this Court asked, "Is anybody contending that Ms. Champagne should have put the judgment liens . . . on this title opinion?" No one answered, "Yes."

Long Beach's lack of actual notice was not a consequence of a mistake in the title opinion or the result of its failure to obtain a title examination. To the contrary, Long Beach had actual notice that the Bayou Residence was custodial property subject to the provisions of MUTMA. Significantly, a transfer of real property made under § 91-20-19 is irrevocable, and such "custodial property is indefeasibly vested in the minor." Miss. Code Ann. § 91-20-23(2). In dealing with custodial property, a custodian must observe the standard of care that would be observed by a prudent person in dealing with the property of another. Miss. Code Ann. § 91-20-25. In other words, custodial property, once transferred, cannot be returned by the custodian indiscriminately. See, e.g., Sternlicht v. Sternlicht, 876 A.2d 904, 909-11 (Pa. 2005) (money transferred by father into minor daughter's custodian account under uniform transfer to minors act could not be withdrawn by father for his own use).

For example, in a case involving a transfer of real property held in a custodianship under a

law identical to MUTMA, Richardson v. AMRESCO Residential Mortgage Corp., 592 S.E.2d 65, 69-70 (Va. 2004), a court refused to enforce mortgage liens because the recorded instruments in the chain of title to the property showed that the custodian had transferred the property to herself. Therefore, notice of the questionable validity of the transfer of the custodial property placed the mortgagees under a duty to investigate further. Richardson, 592 S.E.2d at 70. As recognized in Mississippi, the "duty to inquire" arises when a party has actual knowledge of facts that would lead a reasonably prudent person to question the sufficiency of title to property. Metropolitan Nat'l Bank v. United States, 901 F.2d 1297, 1304 (5th Cir. 1990).

On its face, the title opinion itself presented Long Beach with numerous problems. How Long Beach responded to those problems, in comparison to how a reasonable, prudent, and honest lender would respond, is the lynchpin of the culpable negligence issue. Notably, not a scintilla of first-hand, personal testimony about the loan closing was offered at Trial. Nonetheless, the testimony of Chase's own two witnesses, Bell and Rodriguez–both of whom are attorneys, supports a finding of culpable negligence[26] as well as the testimony of Champagne.

Bell testified that a prudent lender would find out why an infant child owned the property securing the debt of a prospective borrower. She agreed a prudent lender would make sure all prior

---

[26] Their opinions concerning industry-wide practices in the lending industry were admitted under Rule 701 of the Federal Rules of Evidence over the objection of Chase. Rule 701 allows lay witnesses to offer opinion testimony when it is "based on personal perception" and is helpful to the fact finder. See Miss. Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373 (5th Cir. 2002). If these two requirements are met, "a layman can under certain circumstances express an opinion even on matters appropriate for expert testimony." Soden v. Freightliner Corp., 714 F.2d 498, 511 (5th Cir. 1983); see also Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc., 414 F.3d 546, 551-52 (5th Cir. 2005) (Rule 701 allows testimony by corporate officers or business owners on matters that relate to their business affairs, such as industry practices). Bell and Rodriguez both have personal knowledge of the residential lending industry, and Chase had the opportunity to rehabilitate its witnesses on redirect examination.

loans were released before issuing a new loan and that there was a current title opinion at the time of the loan closing.  Bell acknowledged that after the August 30, 2002, title opinion was issued, John Shavers  reacquired title to the Bayou Residence and admitted that the judgment liens enrolled against him attached to the property at that time, but the files of Long Beach did not show any attempt to update Champagne's title opinion.

Rodriguez was questioned why Elite Title did not update the title examination before the loan closing date and after the transfer of property from the child, Ariana Shavers, to John Shavers. Rodriguez admitted that her company should have, but did not, and further admitted that she probably would have required an updated title if she had been involved.  She agreed that the liens of the Judgment Creditors would have been found if the public records had been searched in his name and that under Mississippi law, the liens immediately attached to the Bayou Residence when the property was conveyed back to John Shavers.

Champagne testified that in her opinion[27] Long Beach should have required a title examination showing the Bayou Residence in John Shaver's name, stating that she would never have closed a loan that was in the name of John Shavers when she had a title opinion showing the record title owner to be someone else.  Champagne further stated that if she had known B.G. Perry, as custodian for Ariana Shavers, had transferred the property back to John Shavers, she would have performed a title search on John Shavers to determine if any judgments against him had attached to the property.  In her experience, a prudent lender would not loan money to a person who proposes to pledge property as collateral that he does not own.  Instead, a lender would require a title opinion current as of the time it loaned the money, showing the borrower and the record title owner to be the

---

[27] See supra note 24.

same person.  She further testified that the correct procedure after a loan is closed is to "bring the title forward" by searching the records as of the time of recording of the deed of trust.  That way, the update would reveal any intervening judgments between the previous title search and the new deed of trust, and, there is at least an opportunity to stop payment on the checks and terminate the closing.

At closing arguments at Trial, counsel for Koerber likened Long Beach's actions to the following scenario:

> A pedestrian is walking down a street at night, and [Long Beach] is driving 100 miles per hour when he turns his lights off, and turns around to talk to someone in the back seat, and he is texting and runs over the pedestrian.  Then, [Long Beach] says, "But I didn't know you were there.  I didn't have actual knowledge you were there."  Well, that's because you weren't looking, you weren't looking where you were supposed to look.

Counsel's analogy is similar to the reasoning of the Supreme Court of Alabama in Whitson v. Metropolitan Life Insurance Co., 142 So. 564 (Ala. 1932), that a party seeking subrogation "cannot shut his eyes and ignore facts brought to his knowledge, reasonably sufficient to invite diligent inquiry, which, if followed, would result in actual knowledge."  Id. at 567-68 (citations omitted).

The Bayou Residence was not titled in John Shavers's name when he first approached Long Beach about doubling the existing mortgage on it.  Clearly, this transaction was not an ordinary refinance transaction, and a "red flag" should have been raised for Long Beach to investigate the title status of the Bayou Residence and John Shavers's interest in it.  Cf. Newberry v. Scruggs, 986 S.W.2d 853, 858 (Ark. 1999) (failure of title company to find judgment lien upon *two* searches amounted to culpable neglect).  Although Chase complains its predecessor was deceived by John Shavers, the loan transaction under scrutiny in this proceeding is a good example of problematic lending practices.

### c. Will the Judgment Creditors Suffer Substantial Harm by the Allowance of Equitable Subrogation?

The Judgment Creditors contend that Chase would not suffer any prejudice as a result of awarding them priority over Chase because Chase has title insurance through United General that indemnifies Chase against any loss that it may suffer as a result of its deed of trust lien not having a senior lien position. See, e.g., Wilshire Servicing Corp. v. Timber Ridge P'ship, 743 N.E.2d 1173, 1179-80 (Ind. Ct. App. 2001) (fact that title insurer was paid to perform precisely function that would have revealed junior judgment lien is fact within purview of determination of equities).

Before Trial, Chase filed a Motion in Limine (Dk. No. 267) to exclude as inadmissible any evidence of any title insurance policy issued to Chase (or to its predecessors), pursuant to Rules 411, 402, and 403 of the Federal Rules of Evidence and the common-law collateral source rule. At Trial, this Court denied Chase's Motion in Limine and reserved ruling on the admissibility of any such title insurance policy until it was offered into evidence at Trial.[28] (Order Denying Motion in Limine, Dkt. No. 318).

Although there is some contrary authority from other jurisdictions, this Court finds that title insurance is not a proper consideration in weighing the equities between Chase and the Judgment Creditors. See Mort v. United States, 86 F.3d 890, 895 (9th Cir. 1996) (rejecting argument that title insurer would be unjustly enriched if court applied equitable subrogation); AJJ Enters., LLC v. Herns, 2006 WL 3908544 (Conn. Super. 2006) (common-law collateral source rule prevents argument that title insurance renders priority issue irrelevant); Hicks v. Londre, 107 P.3d 1009, 1013

---

[28] Evidence related to the title insurance policy may have been relevant in determining the existence of an agency relationship between Long Beach and the title agent and/or title insurance company, but it was unnecessary for this Court to reach the agency issue, as previously discussed.

(Colo. 2004) (presence or absence of title insurance is irrelevant in determining whether to apply equitable subrogation); Fed. Home Loan Mortgage Corp. v. Moore, 1990 WL 140556 (Ohio Ct. App. 1990) (existence of title insurance policy is irrelevant as to equitable subrogation issue).   Any other result would punish a lender for retaining the services of a title company.   Moreover, there was no evidence presented at Trial indicating that Chase had received any insurance benefits for any loss of priority.

Chase points out that because it seeks subrogation only to the extent of the original principal amount of the BancorpSouth loan, the Judgment Creditors would suffer no prejudice because their liens would be in no worse position.   The Judgment Creditors contend, on the other hand, that they would suffer an injustice if not allowed to maintain their priority position because of their expectation that satisfaction of the BancorpSouth lien would elevate them in priority.   See, e.g., Dedes v. Strickland, 414 S.E.2d 134 (S.C. 1992); cf Sanger Bros. v. Ely & Walker Dry Goods Co., 207 S.W. 348, 350 (Tex. Civ. App. 1918) (no prejudice to junior lienholder merely because it is not elevated in priority).

Application of either of these two views would mean in the refinancing context, either that subrogation would never cause prejudice (because the Court could reduce the amount of the subrogated claim) or subrogation would always cause prejudice (because of the junior creditors' expectations). Between these polar-opposite views lies the better-reasoned middle position argued in the alternative by the Judgment Creditors that changes in the material terms of the original loan caused them substantial prejudice.

It is undisputed that the loan from Long Beach was not a conventional refinancing where a homeowner seeks to lower his monthly mortgage  payment by obtaining a lower interest rate.   The

Long Beach loan was extraordinary in that it did not merely pay off the BancorpSouth lien but also increased the amount of the lien on the Bayou Residence from $264,438.31 to $500,000, with a corresponding increase in monthly mortgage payments from $3,644.01 to $4,536.36. Also, the Long Beach loan raised, rather than lowered, the interest rate from 9.5 per cent per annum under the BancorpSouth loan to 10.4 per cent per annum. Moreover, it extended the term of the maturity date from July 5, 2002, to 30 years. The Long Beach loan, therefore, was not just a refinancing but a "cash-out" refinancing, a way for John Shavers to raise cash. In the vernacular, lenders refer to such transactions as "cashing out home equity," "tapping into real estate equity," and "converting home equity into cash."

As a result of the new loan, John Shavers faced a significantly increased burden on repayment over the life of the loan. Indeed, he defaulted on the loan six months later on April 1, 2003. See, e.g., Carl E. Case & Robert J. Shiller, Mortgage Default Risk and Real Estate Prices: The Use of Index-Based Futures and Options in Real Estate, 7 J. Housing Res. 243, 245 (1996) ("Strong evidence . . . shows that the best single predictor of default is the current ratio of loan to market value for each property.").

This is not a situation where if subrogation is allowed, the Judgment Creditors will stand in the same position they stood originally. Recognizing this, Stelly testified at Trial that if Long Beach had not closed the new loan, he would have attempted to buy the Bayou Residence himself in any foreclosure proceeding. The harm sustained by the Judgment Creditors is made obvious by the amount of Chase's subrogated claim, at least $746,547.64, which includes not only the portion of the loan used to pay off BancorpSouth's deed of trust lien, but also includes interest calculated at 10.4 per cent, late charges, attorney's fees, and various and sundry other fees. (Chase Ex. 13). If

allowed, Chase's subrogated claim would leave the Judgment Creditors with nothing. In balancing the equities, the totality of the circumstances weigh heavily against Chase and in favor of the Judgment Creditors.

### B. Ann Shavers v. Koerber

At the pre-trial conference on June 22, 2009, Ann Shavers announced to Koerber's apparent surprise that her judgment lien was first in priority because her judgment had been enrolled on January 4, 2002, almost one full hour before Koerber's.  From June 30, 2005, until February 2, 2009,[29] Ann Shavers was represented in this proceeding by Julie Ratliff,[30] who filed two trial briefs[31] on her behalf.  In her first trial brief, filed on October 18, 2006, (Dkt. No. 176), Julie Ratliff acknowledged that Koerber's lien was valid and that "regardless of how the [other] Judgment Liens are ranked, Koerber will be paid."  Later in the brief, she mentioned that the Ann Shavers Judgment and the Koerber Judgment both had been enrolled on January 4, 2002.  She did not attach any exhibits to her first trial brief.  Then, on August 14, 2008, Julie Ratliff submitted a second trial brief (Dkt. No. 262), in which she made the same assertions about Koerber's lien and, in addition, wrote, "it is undisputed among the parties that Koerber will be paid from the proceeds being held by this Court."  (Dkt. No. 262).  She attached as an exhibit to her second trial brief a copy of a page from

---

[29] On February 2, 2009, this Court entered an Order (Dkt. No. 289) allowing Julie Ratliff to withdraw as counsel for Ann Shavers.

[30] Julie Ratliff is no relation to Koerber's counsel, Michael Ratliff.

[31] This Adversary was commenced five years ago.  Trial was originally set for November 16, 2006 (Dkt. No. 143), but was re-scheduled for September 11, 2008 (Dkt. No. 255), again for February 12, 2009 (Dkt. No. 284), and for the last time on June 25, 2009 (Dkt. No. 296).  Gina Bardwell Tompkins originally represented Ann Shavers and filed an Answer on her behalf on May 13, 2004. (Dkt. No. 9).

The Judgment Roll indicating that the Ann Shavers Judgment had been enrolled on January 18, 2002.

Less than three weeks before Trial, on June 12, 2009, Ann Shavers, acting *pro se*, filed an Amended and Supplemental Trial Brief (the "Amended Trial Brief") (Dkt. No. 304) in which she plainly asserted that her lien had priority over Koerber's.  She attached as exhibits to her third trial brief pages from The Judgment Roll indicating that her judgment had been enrolled at 8:29 a.m. on January 4, 2002, whereas the Koerber Judgment had been enrolled at 9:14 a.m. on January 4, 2002.

The confusion as to when the Ann Shavers Judgment was first enrolled arises from the fact that it was enrolled twice, first on January 4, 2002 (Ann Shavers Ex. 4) and again on January 18, 2002. (Chase Ex. 16). The testimony of Gibson explained why the judgments of Ann Shavers and Koerber were enrolled so close together on January 4, 2002.  He testified that he obtained a certified abstract of the Ann Shavers Judgment (as counsel for Ann Shavers) as well as a certified abstract of the Koerber Judgment (as a favor to Koerber or to his counsel), from the chancery clerk's office on the same day and immediately thereafter walked both of them over to the circuit clerk's office where he submitted both abstracts for enrollment.  Some time thereafter, Gibson withdrew as counsel for Ann Shavers when a conflict of interest arose between her and Stelly.

Because of the statements contained in her first and second trial briefs, Koerber and Stelly objected to the introduction of any evidence at Trial by Ann Shavers supporting a lien position superior to Koerber's.  Koerber filed a Motion To Strike the Amended and Supplemental Trial Brief of Cross-Defendant Ann Shavers (Dkt. No.306) in which Stelly joined.  (Dkt. No. 309). This Court entered an Order (Dkt. No. 319) that granted in part, and denied in part, the motion to strike without prejudice to the right of Koerber to object at Trial to the introduction of evidence by Ann Shavers

of any new claims or defenses regarding the relative priorities of the judgment liens.[32]

Just before Trial, this Court provided Koerber and Stelly an opportunity to point out any written discovery responses submitted by or on behalf of Ann Shavers asserting that her lien position was second to Koerber's, but they admitted they were unable to do so, despite the volume of discovery engaged in by the parties in this proceeding. Therefore, the only assertions by Ann Shavers in any court document that may be construed as ambiguous are those set forth on her behalf by Julie Ratliff.

As expected, Ann Shavers elicited testimony at Trial that showed her judgment had been enrolled first. Koerber and Stelly complained about unfair surprise. However, both of them filed responses to Smith's Crossclaim admitting that Ann Shavers enrolled her judgment on January 4, 2002. (Dkt. Nos. 5, 6). Moreover, a copy of the certified abstract with that date and time of enrollment noted thereon, was attached as an exhibit by Smith to his Crossclaim filed on April 14, 2004. (Dkt. No. 3). Also, a copy of the same abstract was attached as an exhibit to the amended proof of claim filed by Ann Shavers on March 5, 2009 in John Shavers's bankruptcy case. (Case No. 03-55729, Claim No. 32-1). It is thus disingenuous for Koerber and Stelly to accuse Ann Shavers of changing her claim.

Although a litigant cannot strategically lie behind the log in order to waylay others with a new claim or defense, this Court finds no evidence that Ann Shavers has come close to doing so here. Cf. Bettes v. Stonewall Insur. Co., 480 F.2d 92, 94 (5th Cir. 1973) (upholding trial court's refusal to allow amendment of pre-trial order to include for first time failure of insurer to comply

---

[32] Ann Shavers also filed, *pro se*, an Amended Answer to Crossclaim and Additional Crossclaims (Dkt. No. 303), which this Court struck from the record as untimely, unauthorized, and unduly prejudicial to Chase, Koerber, and Stelly. (Dkt. No. 319).

with statutory notice). It goes without saying that this Court finds no prejudice in allowing Ann Shavers to argue her first lien position under these circumstances.

### C. Ann Shavers v. Stelly

Stelly alleges Ann Shavers forfeited her lien's senior position to his lien because of her alleged failure to act.[33] Stelly relies upon Miss. Code Ann. § 11-7-193, which allows a junior judgment creditor to force a senior judgment creditor to execute his judgment or lose priority. Section 11-7-193 states:

> A junior judgment creditor may give written notice to any senior judgment creditor requiring him to execute his judgment; and if the senior judgment creditor, being so notified, shall fail, neglect or refuse to have execution issued, and levied within ten days from said notice for the satisfaction of his judgment, he shall lose his priority, and the junior judgment creditor may cause execution to issue on his judgment and to be levied on any of the property of the defendant, and the proceeds of a sale thereof shall be applied to the junior judgments so levied.

Miss. Code Ann. § 11-7-193. Thus, if a senior lienholder receives written notice requiring him to execute on his judgment, but fails to do so within ten days, he loses his priority.[34] Stelly's third-ranked lien, however, cannot leap ahead of Ann Shavers's first-ranked lien without also leaping ahead of Koerber's second-ranked lien. Because it is undisputed that Stelly did not provide statutory notice to Koerber, his attempt to supplant Ann Shavers's lien must fail. Even if he had, however, Stelly has failed to prove he has met all the statutory requirements for lien forfeiture.

---

[33] The irony is not lost on this Court that Stelly is faulting his former client for her lack of diligence in enforcing a judgment he himself obtained on her behalf.

[34] Unlike the Mississippi approach, some states, for example, use a statute of limitations as a means of protecting junior creditors from senior creditors who refuse, fail, or neglect to execute a levy on property of a judgment debtor. See, e.g., In re Zampatti, 300 B.R. 415 (Bankr. W.D. Pa. 2003).

The Mississippi Supreme Court has noted that a junior creditor obtains a preference by positive action on his part and inaction on the part of the senior creditor.  For example, in Dabney v. Stackhouse, 49 Miss. 513 (Miss. 1873), within ten days after the junior lienholder provided the senior lienholder the required statutory notice, both of them sought to execute on the property in question.  However, because of the potential claim of a third party, the sheriff required a bond.  The junior lienholder provided the bond, but the senior lienholder failed to do so until after the date originally set for the sale.  The Mississippi Supreme Court held that the junior lienholder had priority because the seizure of the property was due to his superior diligence and risk.  Id. at 517.

After Long Beach loaned $500,000 to John Shavers, but before any bankruptcy filings, both Ann Shavers and Stelly took affirmative steps to enforce their judgments against John Shavers.  On December 20, 2002, Gibson wrote the chancery clerk of Harrison County a letter requesting that he issue a writ of execution as to the Bayou Residence, for satisfaction of the Ann Shavers Judgment. (Stelly Ex.7).  Almost five months later, on May 16, 2003, Stelly sent Ann Shavers a letter, by certified mail and return receipt,  requesting that she commence execution against John Shavers on any property that may be subject to her judgment within ten days.  (Ann Shavers Ex.11; Stelly Ex. 3).  Ann Shavers received the letter on May 22, 2003, but took no other action to enforce her judgment.  (Ann Shavers Ex. 11; Stelly Ex. 4).

On July 7, 2003, the circuit clerk issued an execution of judgment to the sheriff of Harrison County as to the Bayou Residence in favor of the Stelly Judgment. (Stelly Ex. 5; Ann Shavers Ex. 12).  Stelly testified at Trial that the sheriff refused to execute upon the property because the record

title owner was not John Shavers, but B.G. Perry, as custodian for Ariana Shavers.[35]   As a result, Stelly sued the sheriff in circuit court, and during a hearing on the matter, was notified at the courthouse that John Shavers had filed a voluntary petition for bankruptcy on behalf of Ariana Shavers.

Stelly contends that his May 22, 2003, written demand letter to Ann Shavers, coupled with her subsequent inaction, were sufficient under the provisions of § 11-7-193 to forfeit her lien priority.   He further contends that even if she had taken action, Mississippi law would still grant him a superior priority lien because of his exercise of greater diligence.   He insists that because he actively attempted to execute upon the Bayou Residence, albeit unsuccessfully, he should not be treated less favorably than Ann Shavers under circumstances where she did nothing.

Stelly relies on the Mississippi Supreme Court's decision in Curry v. Lampkin & Conner, 51 Miss. 91 (1875).   In Curry, after a junior creditor sent proper notice, the senior creditor promptly attempted to act on that notice in order not to lose his priority.   However, the senior creditor's levy was returned "No property found," whereas the junior creditor successfully executed a levy against property of the judgment debtor after the ten-day statutory notice.   The Mississippi Supreme Court found in favor of the junior creditor because of his "superior diligence," and it was not enough that the senior creditor attempted to execute its judgment in order to retain his seniority.

Stelly maintains that Curry demonstrates the goal of the statute of rewarding the diligence

---

[35] As previously noted, John Shavers transferred the property back to B.G. Perry, as custodian for Ariana Shavers, on September 23, 2002, shortly after he executed the promissory note and deed of trust in favor of Long Beach.   Notably, a buyer who purchases property on which there is an enrolled judgment lien holds it subject to the right of the judgment creditor to have it seized under a writ of execution for the satisfaction of the judgment.   See Motors Sec. Co., 83 So. 2d at 179.

of a junior creditor. Ann Shavers, on the other hand, maintains that <u>Curry</u> shows that an actual levy by the junior lienholder must take place in order to effectuate forfeiture of the senior creditor's priority. In so holding, the Mississippi Supreme Court equated positive action with *successful* execution and levy on property of the judgment debtor. Indeed, the <u>Curry</u> Court found that "[t]he conduct of the sheriff by a failure to levy any execution in his hands, will not change the lien of judgments." <u>Id</u>. at 92.

According to the <u>Curry</u> Court, the purpose of Miss. Code Ann. § 11-7-193 is to prevent "a senior creditor . . .[from] availing himself of the labor of another . . . who has used extra diligence." <u>Id.</u> Similarly, in <u>Dabney</u>, the junior judgment creditor argued that he was entitled to preference over the senior judgment creditor because the junior creditor had obtained notice under the statute, levied property of the judgment debtor, and indemnified the sheriff before the senior judgment creditor. The <u>Dabney</u> Court held that it was the superior diligence of the junior creditor that entitled him to preference over the senior creditor. The Mississippi Supreme Court's decision in <u>Dabney</u>, rendered before <u>Curry</u>, interpreted the statute in a similar way.

Ann Shavers concedes that Stelly requested and received a writ of execution on July 7, 2003, but, she insists, he did not levy, as required by law, against the Bayou Residence before August 6, 2003, when Ariana Shavers filed for bankruptcy and the automatic stay blocked any further action against the Bayou Residence. 11 U.S.C. § 362(a). Ann Shavers contends that Stelly's argument overlooks his failure actually to levy against any of John Shavers's property under his writ of execution, which was issued almost one full month before the bankruptcy filing. Stelly's argument also overlooks the fact the "priority loss" is, or would be, only as to the proceeds from the execution sale itself.

This Court agrees with Ann Shavers that levying does not eviscerate the existence and/or validity of the senior lien itself.  The Mississippi Supreme Court's decisions in Dabney and Curry demonstrate that in Mississippi superior diligence requires more than just giving statutory notice. Only affirmative action by the junior creditor that actually results in the procurement of proceeds from a proper execution and levy on a judgment debtor's property entitles the junior judgment creditor to priority of those proceeds.  As the Dabney Court noted, if the junior creditor had not indemnified the sheriff, which was not a requirement of the forfeiture statute, the property would have returned to the debtor and, as Dabney implies, all parties would have returned to their original positions.

This interpretation of the statute is reinforced by the Mississippi Supreme Court's position in Dibble v. Norton, 44 Miss. 158 (1870), in which the Mississippi Supreme Court explained that it is "under his levy" by which preference is gained by the junior creditor.  Also, this interpretation is consistent with the Mississippi Supreme Court's holding that the statute rewards superior diligence and the wording of the statute, which suggests that a junior creditor is only entitled to those proceeds "so levied."  The premise of the statute, as suggested by Curry and Dabney, is that the senior creditor should not reap the reward of the junior creditor's work or superior diligence.

Here, Stelly has not sown anything that Ann Shavers can reap for herself. Stelly attempts to equate notice with the "positive action" required in Curry.  However, in both Curry and Dabney, the Mississippi Supreme Court protected and rewarded the junior creditor for accomplishing what the senior creditor failed or refused to do–execute and levy.  Giving notice does not merit the reward of priority through diligence and positive action as contemplated by Curry, Dabney, or the plain language of the statute.  Accordingly, Ann Shavers has a proper first lien ahead of Stelly to the funds

Page 51 of  52

currently being held in the registry of the Court.

## Conclusion

Based on the foregoing, the Court concludes that the Clerk of the Court should distribute the net sales proceeds that are currently being held in the registry of this Court (Dkt. No. 225), as follows: Ann Shavers should be paid the principal amount of $93,946.51, plus interest at the rate of 8 per cent accrued from November 26, 2001, but not to exceed a combined total amount of $100,000;[36] Koerber should be paid the principal amount of $48,531.67, plus accrued interest[37] at the rate of 8 per cent from November 26, 2001 until paid; and Stelly should be paid the principal amount of $250,000, plus interest accrued at the rate of 8 per cent from July 29, 2002, until paid. The Court further determines that these amounts should be paid in that order until depletion of the net sales proceeds.[38]

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  October 19, 2009

[36] As noted previously, Ann Shavers agreed by Consent Judgment to limit her entire claim to $100,000.  (Adv. Proc. No. 04-05123, Dkt. No. 5; Case No. 03-55729, Claim No. 32-1).

[37] See 11 U.S.C. § 506(b); see also United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1985) (holding that § 506(b) applies to non-consensual claims).  None of the Judgment Creditors quantified in their proofs of claim the amount of pre-petition interest they sought.  See Miss. Code Ann. § 75-17-7 (authorizing courts to set rate of post-judgment interest). However, at Trial, all Four Claimants sought recovery of interest at the rate of 8 per cent from the date of their liens. (Pre-trial Order, Dkt. No.320). Applying an 8 per cent interest rate pre-petition and post-petition eliminates the need for making separate calculations under 11 U.S.C. §§ 502, 506(b).

[38] There are sufficient funds to pay Stelly the entire principal amount of $250,000, but not the full amount of interest due him, which leaves no proceeds to pay Chase any portion of its claim.